IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARYL TILLMAN,                          )
                                        )
                                        )
                    Plaintiff,          )       Case No. 04 C 6674
        v.                              )
                                        )       Judge Virginia M. Kendall
UNITED STATES OF AMERICA,               )
                                        )
                    Defendant.          )
                                        )

## MEMORANDUM OPINION

Plaintiff Daryl Tillman ("Tillman") filed suit against the United States of America ("Defendant") claiming that Defendant's negligence was the proximate cause of injuries he sustained when he fell in Defendant's parking lot area. Tillman suffered serious injuries including a multiple fracture of his ankle which required metal implants. Unfortunately for Tillman, he already suffered from a serious back injury from his days in the military when he fell fifteen feet while repelling from a helicopter. His back condition worsened after the fall in the parking lot, and he seeks damages from Defendant for the exacerbation of that pre-existing condition. In spite of the obviously painful and serious injuries suffered by Tillman, the Court finds after a bench trial that Defendant did not owe a duty to him, and therefore he can not recover damages from Defendant. Judgment is entered for Defendant as set forth below.

## I.    Findings of Fact

### A.  The Location of the Incident

Great Lakes Naval Station ("Great Lakes") is an United States Navy training facility and station located in Great Lakes, Illinois, along Lake Michigan. The United States owns and maintains the Navy Exchange ("NEX"), which is located in Burkey Mall on Green Bay Road and is open to armed forces personnel, veterans, and their family members.  On January 30, 2001, the Burkey Mall facility consisted of the commissary and the NEX, which contained a liquor store, department store, video store, and dry cleaner, among other smaller shops.  *Trial Testimony of Daryl Tillman* (hereinafter "Tillman"), *Kathy Tillman* (hereinafter "K. Tillman"), and *Evelyn Clintsman* (hereinafter "Clintsman"); *Deposition Testimony of Keith Morgan* (hereinafter "Morgan").  The NEX and the commissary were connected in the same building through a hallway between the two.  *Tillman*.  This hallway was located nearest the NEX's main entrance, which is at approximately the middle of the building.  *Def. Ex. B; Tillman*.

The NEX also had a large parking lot directly east of the facility.  *Tillman; K. Tillman; Clintsman; Morgan; Def. Ex. B*.  This parking lot also extended along the south side of the facility. Kang; Morgan; Def. Ex. B.    There was one main entrance to the NEX and approximately three other entrances to the NEX's portion of the building: one on the southern end through the dry cleaners, one through the liquor store.  *Tillman; Morgan; Clintsman; Kang; Def. Ex. C2, C3*.  The liquor store or "package store" as some patrons called it, had an entrance from the parking lot in January 2001 and customers could access other parts of the NEX facility through the liquor store. *Tillman; Clintsman; Morgan*.

The NEX had one main entrance from the parking lot which was designed with a clearly marked cross walk to lead customers to that main entrance. Visitors walked generally west (or north if they parked along the south side of the building) and across the parking lot. As visitors approached the end of the main parking lot, they had to cross a two-way traffic road designated with stop signs and crosswalks leading into the NEX's main entrance. *Tillman, Kang, Mann; Def. Ex. B-D.* On the southern end of the parking lot, a raised, concrete parking median separated the main parking lot and traffic lanes from a row of approximately 12 reserved and handicapped parking spaces. Like the building, the parking median also runs in a generally north-south direction, but it is not connected in any fashion to the building. *Kang; Morgan; Clintsman, Tillman; K. Tillman; Mann; Def. Ex. B-D.* Viewing the raised parking median from the east, it is approximately 5-6 feet across (i.e., from east to west) and roughly 100 or more feet long (i.e., from north to south). *Morgan; Tillman; Def. Ex. B-D.*

This raised concrete median was encircled entirely by a curb and gutter system. The western curb contains metal drains (also known as inlets), which are designed in part to remove surface water run-off from the reserved/handicapped parking area. *Kang; Mann, Tillman; Def. Ex. C-D.* The raised parking median also contained metal signs anchored in the concrete designating the reserved and handicapped parking spaces. *Tillman; Kang; Mann; Clintsman; Morgan; Def. Ex. C3-6, 12 and D1-3, 17.* After crossing over the raised parking median and walking through the reserved/handicapped parking spaces, a person trying to access the entrance to the liquor store would be required to cross another one-way roadway before reaching the sidewalk immediately adjacent to the building. That roadway serves cars that are parking in the reserved and handicapped spaces. *Kang; Tillman; Mann; Def. Ex B-D.*

**B. Weather Conditions the Day of the Fall**

On January 30, 2001, Tillman fell on this concrete median that separated the main parking lot from the reserved and handicapped parking spaces. *Tillman*. On that day, there was snow on the ground. *Clintsman, Tillman; K. Tillman*. The exact amount of snow is disputed but weather records from the Waukegan Regional Airport's weather station recorded 37 inches of snowfall over 13 snow days of December 2000. *Def. Ex. E2 at 32-33; Def. Ex. F1 at 1; Def. Ex. F2 at 5.*[1] Similarly, the month of December 2000 set a record for snowfall measured at the Chicago Botanical Garden weather station at 31.3 inches total. *Def. Ex. F3 at 5.* A one-day snowfall record was set on December 30, 2000, at 7.2 inches. The period of record for those snowfall totals is 1981-2003. Def. Ex. F3 at 5. The average daily temperature recorded at the Waukegan Regional Airport weather station during December 2000 was 16.5 degrees Fahrenheit. *Def. Ex. E2 at 2.* Between December 13, 2000, and January 30, 2001, the maximum daily recorded temperature never rose above freezing for 33 out of 49 days (67% of the days during that time period). *Def. Ex. E2 at 18-19; Def. Ex. E3 at 18-19.* At the Chicago Botanical Garden's weather station, the average daily recorded temperature in December 2000 was 18.2 degrees Fahrenheit. *Def. Ex. E2 at 2.*

During January 2001, the Waukegan Regional Airport's weather station recorded three inches of snowfall over four snow days. *Def. Ex. F1 at 1.* In January 2001, the average daily temperature recorded at the Waukegan Regional Airport weather station was 24.5 degrees Fahrenheit, and 25.8 degrees Fahrenheit at the Chicago Botanical Garden. *Def. Ex. E3 at 2.* The Chicago Botanical Garden weather station recorded 0.12 inches of precipitation on January 29, 2001; 0.57 inches on

---

[1] "Def. Ex." refers to the United States' exhibits, which are contained in volumes 1 and 2 of the trial exhibit binders provided to the court during the trial.

January 30, 2001; and 0.17 inches on January 31, 2001. Def. Ex. E3 at 9. The Waukegan weather station recorded 0.08 inches of precipitation on January 29, 2001; 0.75 inches on January 30, 2001; and 0.15 inches on January 31, 2001. Def. Ex. E3 at 9. As of January 30, 2001, the amount of "snow on ground," as recorded at the Waukegan Regional Airport and the Chicago Botanical Garden, measured at least 4 inches deep. The "snow on ground" measurement consists of snow, sleet, ice, and hail. *Def. Ex. E3 at 31, 33*.

**C. Tillman's Fall on January 30, 2001**

Tillman moved to the Chicago area in 1995 while serving in the Army. Between 1995 and 1997, Tillman lived on Great Lakes Naval Station, until he married his wife, Kathy, in 1997. *Tillman; K. Tillman*. Between 1995 and January 30, 2001, Tillman shopped at the NEX at least once a week. Each time he arrived, he testified that he usually parked in the NEX's main parking lot and generally accessed the NEX through the liquor store's entrance - the same path that he took the day of his fall. *Tillman*. Tillman was aware that on January 30, 2001, there were marked crosswalks in the road between the NEX and the main parking lot. *Id.* The crosswalks were located immediately north of, and adjacent to, the raised concrete parking median upon which Tillman fell. They provided NEX patrons with safe access from the main parking lot to the building's main entrance. *Tillman; Mann; Kang; Morgan; Clintsman; Def. Ex. B-D*. On Tuesday, January 30, 2001, Tillman went to the NEX to buy his wife flowers for Valentine's Day. Tillman knew that the florist was located nearest to the hallway connecting the NEX with the commissary and that the florist had never been located near the liquor store's entrance to the facility. *Tillman*.

The weather on Tuesday, January 30, 2001, was cold and overcast. *Tillman; Clintsman, Def. Ex. E1, 3*. Clintsman, an employee of the NEX, recalled that it was snowing lightly around the time

of Tillman's accident. *Clintsman*. The Waukegan Regional Airport weather station recorded rain, snow, fog, and haze that day. *Def. Ex. E1 at 2*. Tillman was wearing tennis shoes, jeans, a shirt, and a full, ankle-length leather coat that day. *Tillman*. When he arrived at the NEX, Tillman parked his car in approximately the southern-middle portion of the main parking lot and proceeded directly east across the lot. He was intending to access the liquor store's entrance, instead of walking towards the crosswalks that lead to the main entrance, which would have brought him closer to the florist inside the facility. *Tillman*. He chose this route across the median because it was the "quickest way to get through" to the and that, as a "military man," he preferred to take the "direct route" to things. *Tillman deposition*.

When he approached the cement median, Tillman admits that the entire median was completely covered in snow and ice. *Tillman*. He also acknowledged that the snow cover was high enough "to know that you didn't want to step on top of it." *Tillman*. Plaintiff decided to cross over the median by following a pedestrian-made path in the snow and ice. He admitted that the snow bank bordering either side of this path was at least 6-7 inches high. *Tillman*. Tillman also acknowledged that the snow and ice was piled higher on the western curb/edge of the raised parking median, where it was at least 4-6 inches high. *Tillman*. Although he did not know how the snow and ice came to be gathered on the median, Tillman believed that it appeared as though "that's how the snow fell," and that he did not see anyone from the United States placing or plowing the snow onto the median. He stated that the parking lot looked as if it had been plowed at some point. *Tillman*. Although they did not testify about the plowing of the lot on that day or any days prior to the incident, two NEX employees stated in general that the main parking lot is plowed from north to south and snow may end up on the median. *Morgan; Clintsman*.

Having lived in Texas and other parts of the south before coming to the Chicago area in 1995, Tillman was not accustomed to snow and that, despite having lived here since 1995, he felt like snow was a "new thing" to him. As a result, Tillman said that he tried to avoid snow as much as he could. *Tillman deposition*. Nevertheless, Tillman stated that he had made at least ten previous trips to the NEX when the facility and parking lot appeared as they did on the day he fell, and that he had crossed this concrete median at least twenty times on those prior occasions. *Tillman*. Tillman further admitted that even if the United States had placed signs warning patrons about the snow and ice on the median, he would have done the same exact thing in crossing the median. *Tillman*.

As he attempted to cross the parking median, Tillman stated that his right foot slipped on the snow and ice along the western curb, causing his right foot to hit an exposed lip on the curb causing him to fall backward onto the eastern edge of the median. *Tillman*. After falling, Tillman stated that he hit his head on the eastern portion of the median and blacked out briefly although he also stated that he remembered seeing a truck in the roadway that he had just crossed and hoped that it would not hit him. *Tillman*. Great Lakes Naval Hospital records state that Tillman denied losing consciousness, denied neck or back pain, and denied any numbness or tingling in his leg. *Def. Ex. O at 16, 22*. After Plaintiff fell, an employee of the NEX, Clintsman, responded to Tillman's accident and waited until an ambulance arrived. *Clintsman*. Clintsman stated that it was cold and snowing lightly at the time of Tillman's accident and that she had to climb over a snow bank to reach Tillman. *Clintsman*. She did not observe any portion of the concrete median visible under the snow and ice that day. She also had never seen anyone crossing that median prior to Tillman's accident. *Clintsman*. Clintsman described a scene with more snow on the median than shown in photographs received into evidence from the United States that were taken in January 2005. *Clintsman; Def. Ex.*

*D1-3.* Tillman also stated that there at least 6-7 inches of snow on the top of the median and 4-6 inches along the western curb.

### D. The Condition of the Median

In January 2003, two years after the incident, architect Richard Mann inspected and measured the median where Tillman fell. Mann concluded that the cross slope of the median measured 9-10% and that there was an exposed lip on the western curb of the median that measured 5/8 of an inch to 7/8 of an inch. He compiled his measurements by utilizing a four-foot carpenter's level and a standard tape measure. Though his letter indicated that he measured the median at 5'5" wide at the spot where Tillman fell, it did not explain specifically where on the median that spot was located. *Pl. Ex. 23; Mann.* In a letter dated February 14, 2003, Mann concluded that he believed either the cross slope and/or the exposed lip on the median caused Tillman's fall and that the median violated the City of North Chicago's sidewalk construction standard, which calls for a 2% cross slope on sidewalks. *Pl. Ex. 23; Mann.* At trial, he further stated that he believed an unnatural accumulation of snow and ice existed on the western edge of the median at the time Tillman fell. *Mann.*

Jason Kang, an employee with the Naval Facilities Engineering Command (NAVFAC) Midwest at Great Lakes who holds several advanced degrees in civil engineering testified that: (1) the area where Tillman fell is a raised concrete median and not a sidewalk intended for pedestrian use; (2) the Navy does not follow municipal construction standards, rendering the North Chicago standard Mann examined inapplicable to Great Lakes location; (3) the median does not violate federal construction standards; (4) Mann used an incorrect method and approach when calculating the median; (5) the amount of snow and ice covering the median, based on Tillman's testimony, would have negated any of the alleged defects that Mann and Tillman claim contributed to Tillman's

fall; and (7) it is not customary from an engineering perspective to place warning signs on a median such as this one. *Kang*. Kang testified that the median serves two purposes: (a) to create a reserved and handicapped parking area; and (b) to channel surface water run-off into two drains on the western edge of the median to keep water from accumulating in the main parking lot. He stated that the area is most appropriately defined as a median because it is isolated and not physically connected to the NEX building in any way and does not lead a pedestrian crossing it to anything, as sidewalks usually do. *Kang; Def. Ex. B-D*. Kang further stated that individuals who crosses the median from east to west would be stepping into the reserved and handicapped parking spaces after crossing the median; whereas sidewalks do not typically lead people directly into parking stalls. *Kang; Mann; Tillman; Clintsman; Morgan; Def. Ex. B-D*. Kang testified that sidewalks typically have handicapped ramp access but the median where Tillman fell does not contain any such ramps although they existed on sidewalks that led to the main entrance of the NEX. *Kang; Def. Ex. B, C1*.

### E. Treatment for Broken Ankle

After calling the paramedics, Clintsman waited with Tillman until an ambulance arrived that took him to Great Lakes Naval Hospital where he was treated by Naval medical personnel. *Tillman; Clintsman; Def. Ex. O at 22*. Tillman's dislocated ankle was reduced in the emergency room on January 30, 2001. He underwent an open reduction, internal fixation of his right ankle on January 31, 2001, also at Great Lakes. All of Tillman's ankle treatment and surgery, which was performed without any complications, was handled by Navy physician Dr. Richard Makowiec. *Tillman; Makowiec; Def. Ex. O at 16, 22*. Tillman was discharged to his home from Great Lakes Naval Hospital on February 1, 2001. *Tillman; Makowiec; Def. Ex. O at 14-15*. At the time of his discharge, Tillman was prescribed Tylox. *Def. Ex. O at 14*.

Aside from $23 for meals during his stay, Tillman did not have to pay for any medical expenses associated with his treatment at Great Lakes Naval Hospital. *Tillman*. Tillman underwent follow-up evaluation of his ankle injury, which was unremarkable for any complications. Tillman's cast was removed on March 9, 2001, and he began bearing weight on his right ankle on that date. *Def. Ex. O at 10; Makowiec.* On May 3, 2001, Tillman underwent elective surgery to remove the syndesmotic screw placed in his ankle on January 31, 2001. That procedure was also performed by Dr. Richard Makowiec without complications. Tillman received a local anesthetic intravenously for that procedure. *Makowiec; Def. Ex. O at 6.* Tillman was discharged from Great Lakes Naval Hospital on May 4, 2001, following his elective screw removal. *Def. Ex. O at 4-5*. Tillman's last visit with his orthopaedic surgeon, Dr. Richard Makowiec, was on May 16, 2001. *Def. Ex. O at 3; Makowiec.*

G.    **Tillman's Prior Back Injury**

While in the Army in May 1985, Tillman fell approximately 15 feet while rappelling from a helicopter and landed on his back. *Tillman; Penn.* Tillman later underwent a fusion of the discs at L5-S1 in 1987 as a result of the 1985 injury, and took approximately 3 months to recover from the surgery. *Tillman; Penn.* Upon recovery, Tillman remained in the Army and continued to exercise three days a week for two hours each day. Tillman testified that he was a speed walker and lifted weights but was restricted from doing sit-ups and push-ups. *Tillman; Penn.*

After moving to the Chicago area in 1995, Tillman began undergoing treatment for his back related to his 1985 injury. Tillman testified that doctors explained to him that his continued exercise routine had led to the deterioration of his sacroiliac joints, causing them to become bone-on-bone. As a result, Tillman began receiving cortisone shots in his sacroiliac joints every six months to

control his on-going back pain. *Tillman; Penn.* In 1999, Tillman began seeing Dr. Eugene Lipov,

an anesthesiologist who runs a pain management practice. Between 1999 and January 2001,

Tillman underwent several epidural steroid injections into his SI joints with Dr. Lipov as well as

radio frequency and IDET procedures, which involved inserting needles into Tillman's spine and

applying heat to the surrounding discs and nerves in an effort to destroy them and, hopefully, limit

the pain response. Unfortunately, these forms of treatment provided only short-term relief to

Tillman. *Penn; Lipov; Def. Ex. G, L.*

Between January 2000 and January 2001, Tillman underwent six epidural injections and

radio frequency and/or IDET procedures with Dr. Lipov. *Penn; Def. Ex. L at 333/295, 305/267,*

*274/236, 242/204/206, and 213/175; Def. Ex. G.* Prior to the accident at the NEX, Tillman's most

recent course of treatment consisted of epidural injections and radio frequency on January 18, 2001.

*Ex. G at 185.*

## H.    Tillman's Back Pain Complaints After January 2001

Tillman testified that about one week after his fall at the NEX, his back began to hurt more

than it had before the fall. He described the pain as "intense" and "brutal" and that before the

accident he had never experienced this kind of pain. *Tillman.* Tillman testified that he first saw Dr.

Lipov about this pain in late February or early March. *Tillman.*

According to Dr. Lipov's records from that time period, Tillman reported his back pain as

a "4 out of 10" on February 12, 2001, and that his pain that day was primarily in his right leg. *Def.*

*Ex. G at 425; Penn.* Tillman next saw Dr. Lipov on April 30, 2001, and reported that his back pain

was "6 out of 10" due to the discomfort of wearing a cast and using crutches. *Def. Ex. G at 426;*

*Penn.* Dr. Lipov did not change Tillman's treatment regimen at either of those visits. *Def. Ex. G*

*at 425-26; Penn.* Earlier records from Dr. Lipov indicate that Tillman had experienced significant pain at various times prior to the January 30, 2001 fall. *Def. Ex. G. at 144, 412.*

In October 2001, Dr. Lipov implanted a programmable morphine pump in Tillman. Tillman believes that the pump was necessitated by the back injury sustained during his January 30, 2001 fall. Dr. Lipov testified that he presumes Tillman's 2001 fall might have sped up Tillman's underlying degeneration, but Dr. Lipov did not know to what extent. *Lipov at 52-53.* Dr. Lipov acknowledged during his deposition that Tillman did not have a "normal back" prior to the January 2001 fall, due to his prior spinal surgery, and acknowledged that he could not separate out what costs for back pain came from the prior treatment, and what portion from the 2001 fal. *Lipov at 52-53, 55.* He also acknowledged that he did not know any of the details of Tillman's 1985 injury, or know about the fall in 2002. *Lipov at 52-53.*

Dr. Richard Penn, a neurosurgeon from the University of Chicago, testified for Defendant as its expert on Tillman's back pain. Dr. Penn testified to his opinion that any increased back pain that Tillman has reported since January 2001 is not attributable to his January 2001 accident. Dr. Penn relied in part upon Tillman's personal statements as to his level of pain before and after the 2001 fall. Dr. Penn also relied upon the Great Lakes Naval Hospital medical records, which indicate that Tillman denied any back pain following that fall and was not treated for any back, head, or neck injuries. *Penn; Def. Ex. G, O.* Dr. Penn acknowledged, however, that it is likely Tillman experienced a temporary increase in back pain during the time he wore a cast and used crutches because of the gait changes associated with the cast and crutches. But, he also testified that any such pain would have resolved not long after Tillman's ankle injury was cleared in May 2001. *Penn; Def. Ex. G, O.*

Dr. Penn also testified that the insertion of a programmable drug pump in Tillman was not necessitated or caused by the January 2001 accident. Dr. Penn testified that Tillman was a candidate for the programmable drug pump as early as 1999 and that the timing of the January 2001 accident and the insertion of the pump are not related. *Penn.* He explained that the pump was another treatment option for Tillman's pre-fall, chronic back pain and that, as such, the pump was simply part of the continuum of treatment. In reaching his conclusions, Dr. Penn noted that Tillman's pre-January 2001 back pain complaints (on the VAS pain scale for 1-10) did not differ substantially from his post-January 2001 complaints and that he would have expected to see an increase in the reported pain level following the January 2001 fall, if the fall injured Tillman's back. *Penn.*

I.       **Tillman's Second Fall on Ice in January 2002**

Tillman sustained a second slip and fall injury after falling on icy steps at work on February 4, 2002. *Def. Ex. M at 697; Penn*. Tillman landed on his side in some bushes nearby the icy steps. *Def. Ex. M at 693-94, 697.* Tillman testified that he sustained no injury in this fall. *Tillman.* He remained in the hospital for four days; Tillman testified that Dr. Lipov wanted the hospitalization to make sure the pump had not been damaged. *Def. Ex. M at 693-94, 697-99, 719-20; Tillman; Penn.*

## II.    Conclusions of Law

The Federal Tort Claims Act authorizes private tort actions against the United States for personal injury caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  28 U.S.C. §§1346(b), 2671, and 2674; *United States v. Olson*, 126 S. Ct. 510, 511-12 (2005); *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991).  Because the injury occurred in Illinois, the substantive law of Illinois applies to this case.  *Hess v. United States*, 361 U.S. 314, 318 (1960).   To state a cause of action under Illinois law, a plaintiff must establish that:  (1) defendant owed plaintiff a duty of care, (2) defendant breached that duty, and (3) an injury proximately resulted from defendant's breach. *Curatola v. Village of Niles*, 608 N.E.2d 882, 885 (Ill. 1993); *Staples v. Krack Corp.*, 186 F.3d 977, 979 (7th Cir. 1999).

Whether a defendant landowner has a duty to an injured plaintiff is a question of law. *Staples*, 186 F.3d at 979.  To determine whether a duty exists, a court must "consider not only the reasonable: (1) foreseeability and (2) likelihood of injury, but also (3) the magnitude of the burden on defendant in guarding against injury and (4) the consequences of placing that burden on defendant."  *Id*.  The Illinois Premises Liability Act abolished the common law distinction between invitees and licensees, such that the possessor of land owes a duty of reasonable care to both.  740 Ill. Comp. Stat. 130/2; *Rodriguez v. Norfolk & Western Railway Co.*, 593 N.E.2d 597, 607 (Ill. App. Ct. 1992).   However, that duty of reasonable care is not absolute; it does not include:

a duty to warn of or otherwise take reasonable steps to protect such entrants from conditions on the premises that are known to the entrant, are open and obvious, or can reasonably be expected to be discovered by the entrant; a duty to warn of latent defects or dangers or defects or dangers unknown to the owner or occupier of the premises; a duty to warn such entrants of any dangers resulting from misuse by the entrants of the premises or anything affixed to or located on the premises; or a duty to protect such entrants from their own misuse of the premises or anything affixed to or located on the premises.

740 Ill. Comp. Stat. 130/2. In the case of a defective condition, the defendant must have actual or constructive knowledge of the alleged defect in order to owe plaintiff a duty. *Torres v. United States*, 953 F. Supp. 1019, 1025 (N.D. Ill. 1997). Because the Court finds that the condition of the snow-covered median in the NEX parking lot was both an open and obvious danger, and a natural accumulation of snow, Defendant did not owe a duty of reasonable care to Tillman when he crossed the median and suffered injury.

1. **The Open & Obvious Nature of the Median**

Under Illinois law, persons who own, occupy, or control land are not ordinarily required to foresee and protect against injuries resulting from dangerous conditions that are open and obvious. *Bucheleres v. Chicago Park Dist.*, 665 N.E.2d 826, 832 (Ill. 1996); *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 472 (7th Cir. 1988) (applying Illinois law); *Reeves v. United States*, 1994 WL 577227, at *3 (N.D. Ill. Oct. 18, 1994). The law assumes that persons will recognize the danger and take care to avoid the risk. *Bucheleres*, 665 N.E.2d at 832; *Ward v. Mid-American Energy Co.*, 729 N.E.2d 861, 863 (Ill. App. Ct. 2000). The determination of whether a danger is open and obvious is generally a question of fact, though can be decided as a matter of law where reasonable minds could not disagree, and is based upon the objective knowledge of a reasonable person confronting the same condition. *See Harmon v. United States*, 8 F. Supp. 2d 757, 761 (N.D. Ill. 1998); *Sandoval v. City*

15

*of Chicago*, 830 N.E.2d 722, 727 (Ill. App. Ct. 2005). The open and obvious doctrine continues to exist despite Illinois' adoption of comparative fault. *Bucheleres*, 665 N.E.2d at 831-32. The existence of a defendant's legal duty is separate and distinct from the issue of a plaintiff's contributory negligence and the parties' comparative fault. *Id.*

The snow covering the median was a condition of open and obvious danger. Tillman testified that "4-6 inches of snow" covered the median where he crossed. Photographs taken of the scene two days after the accident support this estimation, and witnesses Tillman and Clintsman testified that the snow on the day of the incident was higher than that in the photograph. Weather reports also indicate that the amount of snow in the photograph is representative of the amount present on the date of the accident.

Because the accident occurred in the middle of the day, the snow would have been visible to Tillman at the time he crossed. The danger of waking through 4-6 inches of ploughed snow covering a median would be recognized by a reasonable person exercising ordinary perception, intelligence, and judgment. *Ward*, 729 N.E.2d at 863. Additionally, Tillman testified that he was wearing tennis shoes and an ankle length coat when he walked through the snow on the median. A reasonable person, particularly one such as Tillman who expressed discomfort in snowy conditions, would realize that this clothing would contribute to the danger of the snow and ice. The court finds that the snow-covered median presented an open and obvious danger to Tillman.

The mere existence of an open and obvious danger, is not a *per se* bar to finding that a landowner has a duty to exercise reasonable care, however. *Bucheleres,* 665 N.E.2d at 833*; Ward,* 729 N.E.2d at 863. Illinois courts recognize two exceptions to the open and obvious doctrine: the distraction exception and the deliberate encounter exception. Thus, in order for defendant to prevail,

must show both that condition was open and obvious and that neither of the exceptions applied. *Reeves*, 1994 WL 577227.

The Court does not address the distraction exception as Tillman offered no evidence that his attention was distracted. The deliberate encounter exception applies in cases where the possessor has reason to expect that the invitee will proceed to encounter the obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk. *Nally v. City of Chicago,* 546 N.E.2d 630, 633 (Ill. App. Ct. 1989) (quoting Restatement (Second) of Torts § 343A); *Prostran v. City of Chicago*, 811 N.E.2d 364, 371 (Ill. App. Ct. 2004). This exception primarily applies to situations involving economic compulsion, such as employees proceeding to encounter obvious dangers in order to fulfill their employment obligations. *Prostran*, 811 N.E.2d at 371. Tillman argues that it was foreseeable that he would walk across the median despite its obvious danger because it provided a direct route to the package store entrance, other customers used the same route, and the median resembles a sidewalk. While this evidence reveals Tillman's preference for using the median, it does not demonstrate he was compelled to do so. *Id*. Instead, the existence of a clearly marked crosswalk only a few car lengths away from the median that safely allowed pedestrians to enter the main mall entrance affirms that Tillman chose to use the median rather than that he was compelled to do so. Therefore, the deliberate encounter exception does not apply to this case.

Finally, a court may not rely upon the open and obvious danger exception to duty until applying the traditional duty analysis by considering the factors of foreseeabilty of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the danger, and the consequences of placing that burden on the defendant. *Ward*, 729 N.E.2d at 863; *Bucheleres*, 665

N.E.2d at 833. The foreseeability and likelihood of injury are inversely related to the obviousness of the danger because it is expected that individuals encountering obvious dangers will avoid them. See *Bucheleres*, 665 N.E.2d at 833; *Ward*, 729 N.E.2d at 864. Because the snow and ice presented an open and obvious danger, the foreseeability and likelihood of danger factors were slight and thus weigh against a finding of duty.

While there are certain measures that Defendant could have taken to guard against this injury, imposing such measures on Defendant would neither be effective nor appropriate. Measures that would impose only a slight burden on defendant, such as posting signs or painting curbs, would be ineffective in guarding against the injury, since it is unlikely that the existence of such measures would deter someone from crossing the median. Such signs would merely identify the open and obvious danger and even if they were posted, Tillman testified that he would have not changed his path. Measures that would be effective, such as erecting a fence around the median, would impose a much greater burden on the defendant. Because the burden of the guarding against the injury and the consequences of that burden on the defendant are not dispositive in the analysis, consideration of the factors weighs in favor of the lack of forseeability, such that no duty should be imposed on the government to guard against the open and obvious danger of the snow-covered median.

2. **The Natural Accumulation Rule**

Tillman argues that Defendant owed a duty to persons crossing the median on the basis of the "unnatural accumulation" rule in Illinois torts. The general rule in Illinois is that property owners, including public entities, are under no obligation to clear naturally accumulating snow and ice from their premises. *Rose v. United States*, 929 F. Supp. 305, 308 (N.D. Ill. 1996); *Meyer v. United States*, 2001 WL 1803638, *3 (S.D. Ill. 2001); *Webb v. Morgan*, 531 N.E.2d 36, 39 (Ill. App. Ct. 1988). However, a property owner

can be liable for injuries caused by unnatural accumulation of ice and snow on his property. *Meyer,* 2001 WL 1803638 at *3; *Webb*, 531 N.E.2d at 39. Such unnatural accumulations can result from an owner's attempt at clearing naturally occurring snow and ice or by design deficiencies that promote unnatural accumulations of ice and snow. *Id.* However, ruts and uneven surfaces created by traffic, including pedestrian traffic, in snow and ice are not considered unnatural. *Rose*, 929 F. Supp. at 308 (when snow has fallen naturally, the mere fact that traffic usage and fluctuating temperatures have molded the snow into an uneven surface of ruts and ridges does not demonstrate an unnatural accumulation of snow or ice."); *see also Galivan v. Lincolnshire Inn*, 497 N.E.2d 1331, 1332 (Ill. App. Ct. 1986) (finding that tire ruts do not amount to unnatural accumulations in unplowed parking lot).

The plaintiff has the burden of proving that the ice and snow on which he fell was an unnatural accumulation caused by the defendant. *Webb*, 531 N.E.2d at 39, and one about which the defendant had actual or constructive knowledge. *Meyer*, 2001 WL 1803638 at *4. This proof must include evidence of a nexus between the defendant and the condition that allegedly caused the injury; mere speculation or conjecture is insufficient to establish liability. *Meyer*, 2001 WL 1803638 at *4; *Branson v. R & L Inv., Inc.*, 554 N.E.2d 624, 629 (Ill. App. Ct. 1990).

Plaintiff has failed to produce evidence that the 4-6 inches of snow on which he fell was an unnatural accumulation. Tillman alleges that the unnatural accumulation for which Defendant should be liable is a pile of icy slush at the edge of the median, which pile formed as a result of a inappropriately steep slope in the median surface. That steep slope, alleges Tillman, is a design deficiency in the median and/or wear and tear on the median surface that Defendant should have repaired. Each party presented evidence that the slope was or was not within design standards for federal parking lots, and presented evidence as to the weather patterns that might have created a repeated freezing/thawing effect that in turn would have

permitted slush to accumulate by the median.[2]  This testimony is not relevant to the Court's ultimate analysis, however, because even if Tillman proved sufficiently that the condition on the median was an unnatural accumulation of snow and ice, he failed to provide evidence that Defendant had actual or constructive knowledge of the defective condition or the unnatural accumulation.  *Meyer*, 2001 WL 1803638 at *6.

Tillman also did not show that the snow and ice were an unnatural accumulation created through Defendant's plowing.  Tillman did not suggest that the snow on the median unnaturally accumulated as a result of the government's plowing of the NEX parking lot, nor did Tillman provide any evidence about the plowing operation that would suggest when or how the lot was plowed to cause an accumulation on the median.  In fact, Tillman suggested that the 4-6 inches of snow on the median appeared to be "as the snow fell."  Accordingly, the court finds that the United States did not cause an unnatural accumulation of snow on the median through its plowing operations.

---

[2]

Under Illinois law, de minimis defects in sidewalks of less than one inch are not actionable.  *Gresser v. Union Pac. R.R.*, 130 F. Supp. 2d 1009, 1014 (C.D. Ill. 2001).  This rule applies to private parties, *Hartung v. Maple Invest. & Dev. Corp.*, 612 N.E.2d 885, 889 (Ill. App. Ct. 1993), and recognizes that the economic burden of requiring property owners like the United States to monitor and repair every minor defect in concrete is immeasurable, particularly when customers have other means of accessing the facility.  *See Harris v. Old Kent Bank*, 735 N.E.2d 758, 764-65 (Ill. App. Ct. 2000).  Richard Mann's measurements, however, foreclose Tillman's recovery, because, at most, Mann measured a 7/8" lip on the western curb.  *Pl. Ex. 23; Mann*.  Tillman claims that after slipping on the ice his foot hit this exposed lip on the curb and caused his fall.  Tillman.  Though the evidence of snow and ice accumulation, alone, defeats Tillman's argument, if such a lip was exposed or existed, it would not form the basis of liability on the part of the United States because it measures less than one inch. Similarly, even if such a lip caused an unnatural accumulation of snow and ice to stick out higher and (contrary to his claims) Tillman's foot struck this higher lip of ice, there would be no basis for liability.  If the condition of the curb is not actionable if unobstructed by snow and ice, it certainly cannot be a basis for liability given the conditions of January 30, 2001.

The court finds that Tillman failed to prove by a preponderance of evidence that the United States knew of the alleged unreasonably dangerous condition on that median on January 30, 2001. At best, Tillman introduced evidence from Naval employee Keith Morgan that on occasion in dry weather he has seen people cross the median. Tillman did not prove, however, that Morgan's observations were made prior to Tillman's accident, and Tillman certainly did not offer evidence demonstrating that NEX personnel knew customers crossed the median during the kind of winter conditions that were present on January 30, 2001. *Hoiseth v. N.E. Reg. Commuter R.R. Corp.*, 562 N.E.2d 602, 606 (Ill. App. Ct. 1990) (plaintiff must prove notice to defendant of defective condition). None of the employees testified to knowing about the excessive slope of the median, nor that snow and ice unnaturally accumulated on the median. According to civil engineer Jason Kang, the slope of the median did not violate federal regulations. *Kang.* Moreover, none of the employees testified to knowing that individuals crossed over the median from the parking lot to the mall during the winter months when it was covered with snow. Defendant could not have knowledge of the accumulation if it never encountered the area of accumulation. The court thus finds that Plaintiff did not prove by a preponderance of the evidence either that the snowy conditions on the median resulted from an unnatural accumulation or that defendant had notice of an unnatural accumulation. Consequently, the government did not owe duty to Tillman to remove the snow.

Because the Court finds that Defendant did not owe a duty to Tillman as he crossed the median through an open and obvious, natural accumulation of snow, the Court need not address the issue of the proximate cause of Tillman's injury, or the amount of damages Tillman should recover.  The Court grants judgment in favor of Defendant United States.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: August 2, 2006